## Commonwealth *versus* Evans.
## Evans *versus* Commonwealth.

1. An Act of Assembly authorized the governor to appoint a special agent to collect "suspended claims against the United States, with a compensation not exceeding," &c.; the governor, by commission under the great seal, appointed Evans, who did not take the oath required of public officers by the Constitution; *Held,* that he was a public officer under Act July 12th 1842.

2. All persons by authority of law intrusted with the receipt of public money, or through whose hands money due to the public may pass to the treasury, are public officers, whether the service be general or special, transient or permanent.

3. Neither the governor nor the auditor-general was authorized to make a contract with Evans for compensation outside of the resolution.

4. A contract to perform the duties of an office is implied by the party accepting.

5. Evans collected money under the act; *Held,* that he was within the provision of the Act of March 30th 1811, denying commissions to persons intrusted with public money and neglecting to account.

6. The governor had not authority to relieve Evans from rendering accounts to the accounting officers of the Commonwealth.

May 21st 1874. Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ:

Writs of error to the Court of Common Pleas of *Dauphin county*: No. 71 and 75, to May Term 1873.

This was an action of assumpsit, brought September 29th 1871, by The Commonwealth of Pennsylvania against George O. Evans. The first count of the declaration was, that defendant had collected money for the Commonwealth in his professional employment as attorney in fact and agent for the Commonwealth; the second, for money had and received by him as a public officer; the third on an account stated. Amongst other things, the defendant claimed 10 per cent. commission on claims which had been disallowed by the war department, but had been afterwards allowed through Evans's agency, no money having been paid to Evans for the state on account of them, but they had been set off against claims due by the Commonwealth to the United States.

The case was tried March 3d 1873, before Pearson, P. J.

The Commonwealth gave evidence, as follows:—

Joint resolution of the legislature of Pennsylvania passed March 3d 1867, to wit:—

"*Whereas,* There is supposed to be due by the United States to the state of Pennsylvania various amounts for disbursements made during the rebellion, but disallowed by the accounting officers of the general government:

"*And whereas,* It is believed that by carefully supplying deficient testimony, many of the amounts may be collected; therefore,

"*Be it resolved,* That the governor be and is hereby authorized

[Commonwealth *v.* Evans.]

to appoint a special agent to collect the disallowed and suspended claims of the state against the United States, whose compensation for that purpose shall not exceed ten per centum of the amounts thus collected, and shall be paid out of such collections."

Commission to defendant by virtue of the resolution, viz:—

"In the name and by the authority of the Commonwealth of Pennsylvania, John W. Geary, Governor of the said Commonwealth.

"Pennsylvania, *ss:*                                    [SEAL.]

"John W. Geary to George O. Evans, Esq., of the city of Philadelphia, sends greeting:

"*Whereas,* In and by a joint resolution of the General Assembly of this Commonwealth, approved the 22d day of March, A. D. 1867, the governor is authorized to appoint a special agent to collect the disallowed and suspended claims of the state against the United States:

"*Now know you,* That having full confidence in your integrity, judgment and ability, I, John W. Geary, governor as aforesaid, have appointed, and by these presents do appoint and commission you, George O. Evans, to be special agent to collect the disallowed and suspended claims of the state against the United States, in pursuance of and in accordance with the above-cited resolution of General Assembly of this Commonwealth.

"To have and to hold this commission, and the appointment hereby granted unto you, together with the rights, powers and privileges thereby conferred, until the same shall be by me, or other lawful authority, suspended or annulled.

"Given under my hand and the great seal of the state, at Harrisburg, this twenty-second day of March, in the year of our Lord one thousand eight hundred and sixty-seven, and of the Commonwealth the ninety-first."

"AGREEMENT WITH DEFENDANT.

"I, George O. Evans, Esq., of the city of Philadelphia, having been appointed and commissioned by the governor of Pennsylvania, under joint resolution of the legislature, approved March 22d 1869, to collect sundry claims, in said resolution mentioned, do hereby obligate myself forthwith to pay over to the state treasurer of Pennsylvania, all moneys which I may be able to collect under said authority, less the commission allowed, and to make semi-annual reports to said state treasurer, of the amounts collected, and the sources from which derived; and also to make annual reports to said governor, under oath, including the amounts collected, and a statement of all claims ascertained to be due the state, and from what sources; and further agree, before entering upon the duties of my appointment, to give bond to the Commonwealth, with two sureties, conditioned for the faithful performance of my duties under said joint resolution and this agreement,

[Commonwealth *v.* Evans.]

in the sum of $10,000; said bond to be approved by the governor and filed in the office of the secretary of the Commonwealth.

"In testimony whereof, I have hereunto set my hand and seal at Harrisburg, this 23d day of March, A. D. 1867.

GEO. O. EVANS, [L. S.]"

"BOND OF DEFENDANT.

"*Know all men by these presents*, That we, Geo. O. Evans, Thomas Woods and John F. Graff, are held and firmly bound unto the Commonwealth of Pennsylvania, in the sum of ten thousand dollars, &c., sealed with our seals, dated the twenty-seventh day of March, Anno Domini one thousand eight hundred and sixty-seven.

" *Whereas*, The said George O. Evans has been appointed by John W. Geary, Governor of Pennsylvania, special agent to collect the disallowed and suspended claims of the state against the United States, in accordance with the provisions of a joint resolution of the General Assembly, approved the twenty-second day of March, one thousand eight hundred and sixty-seven,

"Now, the condition of the above obligation is such, that if the above bounden George O. Evans, special agent as aforesaid, shall faithfully perform his official duties under said joint resolution, and under an agreement entered into by him the twenty-third day of March, A. D. 1867, then the above obligation shall be void, &c.

GEO. O. EVANS, [L. S.]
THOMAS WOODS, [L. S.]
JOHN F. GRAFF, [L. S.]"

"Executive Chamber,
"Harrisburg, Pennsylvania, June 17th 1869.
"Hon. J. F. Hartranft,
"Auditor-General of Pennsylvania:
"Sir:—Please deliver to the bearer, G. O. Evans, Special Agent, the vouchers for military disbursements by the state from 1861 to 1866, needed by him in preparing claims for re-imbursement from the United States.

"You will also oblige me by extending to Mr. Evans the facilities of your office for this purpose.

Yours, respectfully,
JNO. W. GEARY, Governor."

"Executive Chamber,
"Harrisburg, Pennsylvania, March 29th 1870.
"Hon. J. F. Hartranft,
"Auditor-General of Pennsylvania:
"Sir:—Under the Act of Congress, July 27th 1861, authorizing the governors of states to present claims for expenses incurred in raising volunteers during the late rebellion, I respectfully request that you will allow the bearer, George. O. Evans (appointed by me special agent of the state, under the joint reso-

[Commonwealth *v.* Evans.]

lution of the legislature, March 22d 1867), to have duplicate vouchers of expenditures by the state on account of the late war, with the view of collecting, if possible, a class of claims, which, under the rulings of the department officers at Washington, have been technically disallowed and payment therefor refused. By supplying deficient testimony, with proper explanations, and the use of all available precedents, Mr. Evans is confident of obtaining the allowance of a considerable amount equitably due by the United States to Pennsylvania.

"Mr. Evans represents to me that pending legislation in Congress may speedily 'disallow' for ever every claim of this kind, and that prompt action must be taken in the matter. For this purpose, I will gladly render you any assistance within my power.

Yours, respectfully,<br>Jno. W. Geary, Governor."

"Harrisburg, March 30th 1870.

"It is hereby agreed, that the compensation payable to Geo. O. Evans, out of the commission of ten per cent. allowed by joint resolution of the legislature of Pennsylvania, passed March 22d 1867, for the collection of certain claims of the state against the United States (as per Act of Congress, July 27th 1861), shall be such as is deemed equitable and just by J. F. Hartranft, for service rendered in collecting the claims bearing date of settlement by the state officers, from and after December 3d 1862.

"It is further agreed, that the necessary expenses incurred by George O. Evans, for printing, stationery, travelling, and clerical labor, in preparing said claims for settlement by the United States, shall be reimbursed to the said George O. Evans, in addition to the allowance herein referred to. It is further agreed, that if nothing is collected, nothing is to be paid.  J. F. Hartranft."

"Pennsylvania, Executive Chamber,<br>"Harrisburg, Pa., April 13th 1870.

- "To the Honorable George S. Boutwell,
"Secretary of the Treasury U. S., Greeting:

"I hereby nominate and appoint George O. Evans, to act for me, as my duly authorized agent, under the Act of Congress, July 27th 1861 ('for reimbursement of expenses properly incurred by the states, respectively, on account of their troops employed in aiding to suppress the present insurrection against the United States') to present for settlement the claims of the state of Pennsylvania arising under the said act, or any other Act of Congress, for arming, equipping, paying, clothing, subsisting and transporting, &c., the troops of said state, called out for the defence of the United States, and to collect of the United States any money found due - from the United States to the state of Pennsylvania.

"[S. S. GREAT SEAL   Jno. W. Geary, Governor."
  OF THE STATE.]

[Commonwealth *v.* Evans.]

Also : draft of United States dated May 1st 1867, payable at sight to Governor Geary, on endorsement by George O. Evans, special agent of governor, for $78,516.81, "for payment of state for raising volunteers due Pennsylvania on settlement."

Draft of same in same form, dated October 28th 1868, for $105,651.46.

Draft of same in same form, dated August 27th 1870, for $136,846.09. These drafts were endorsed by the defendant.

Letter dated August 15th 1871, from auditor-general and state treasurer to defendant, demanding payment by him, of $291,046.91, the money collected from the United States, and in his hands.

The Commonwealth offered the settlement April 23d 1871, of the accounting officers against defendant, showing a balance of $337,249.12, due by him ; it was rejected and a bill of exceptions sealed. The Commonwealth rested.

The defendant then read : Act of Congress of July 27th 1861, directing the repayment to the several states of the money expended by them in raising volunteers to suppress the rebellion ; Act of Congress imposing a direct tax on the states, fixing the share of Pennsylvania at $1,946,719.33, providing that any state paying its share of the tax into the United States treasury before June 30th 1862, should be entitled to 15 per cent. deduction ; and also that any state might pay its share by release of any liquidated and determined claims of such state against the United States—the abatement of the 15 per cent. to be made on such claims also— also, Act of legislature of Pennsylvania, February 10th 1862, assuming the payment of the tax.

It was admitted that the claims of Pennsylvania against the United States for which vouchers were filed were as follows :

| | | |
|---|---|---|
| March 1st 1862, | . . | $1,182,997.37 |
| June 11th " | . . | 854,337.30 |
| February 1863, | . . | 81,084.91 |
| | . . | $2,118,419.58 |

F. G. Pettingill, examining officer in the third auditor's office of the war claims of the states against the government, testified that these claims were filed as above stated, were examined and reported to the controller November 1st 1865. The third auditor allowed the claims, but the controller reversed his decision and allowed but $112.60, and that amount only passed to the credit of the state : that decision was final.

There was afterwards a special settlement, and there were allowed to the Commonwealth claims amounting to $1,989,115.82 ; these claims were allowed on account of the explanation of defendant ; he filed the vouchers for the 4th, 5th and 6th instalments ; he began his explanation March 27th 1867 ; all his work as to suspended or disallowed claims, as put in writing, embraced twenty six days ; there were fifteen communications, &c.

[Commonwealth v. Evans.]

The defendant then offered to prove in substance the agreement as to compensation with Governor Geary and Auditor-General Hartranft; that he undertook the duties at their request, and in consideration of the compensation which they agreed should be paid him.

The offers were rejected and a bill of exceptions sealed for the defendants.

The defendant testified at great length as to his claim, giving in detail his labors and the difficulties which he encountered; the irregularity of the vouchers and accounts of the Commonwealth; his explanations to the department at Washington, &c., &c.

He gave evidence for the purpose of showing the value of his services, &c.

He gave in evidence receipts from the state treasury for the following payments, made by him:

| 1871 April 25th, | . | . | . | . | $137,872.39 |
|---|---|---|---|---|---|
| " May 19th, | . | . | . | . | 243,167.57 |
| " June 28th, | . | . | . | . | 298,753.08 |

These payments were government warrants, dated respectively April 11th, May 15th and June 23d 1871, endorsed by defendant to Governor Geary and by him passed into the state treasury. Also, receipt of state treasurer, dated July 24th 1871, for $29,267,43. He gave in evidence another government warrant to him, dated August 26th 1870, for $136,486.09.

He gave in evidence the following:

"Treasury Department, Third Auditor's Office,
August 12th 1871.

"Sir: I have the honor to submit the following statement of the condition of the war claims of the state of Pennsylvania, filed in this office under Act of Congress, approved July 27th 1861:—

| First instalment, filed March 1st 1862, | . | . | . | . | $1,182,997.22 |
|---|---|---|---|---|---|
| Second instalment, filed June 11th 1862, | . | . | . | . | 854,337.29 |
| Third instalment, filed February 20th 1863, | . | . | . | 81,084.91 |
| Fourth instalment, filed May 4th 1870, | . | . | . | . | 257,933.18 |
| Fifth instalment, filed June 30th 1870, | . | . | . | . | 762,129.91 |
| Sixth instalment, filed May 25th 1871, | . | . | . | . | 33,737.77 |
| | | | | | $3,172,218.19 |

| Paid on requisition, No. 5069, September 19th 1861, | . | . | $606,000.00 |
|---|---|---|---|
| Paid on requisition, No. 3124, May 2d 1867 (direct tax), | . | 1,304,711.43 |
| Paid on requisition, No. 3125, May 2d 1867, | . | . | . | 78,516.89 |
| Paid on requisition, No. 8511, October 27th 1868, | . | . | 105,651.46 |
| Paid on requisition, No. 4884, August 26th 1870, | . | . | 136,846.09 |
| Paid on requisition, No. 6407, April 11th 1871, | . | . | 137,822.59 |
| Paid on requisition, No. 6689, May 15th 1871, | . | . | . | 242,167.57 |
| Paid on requisition, No. 7122, June 23d 1871, | . | . | . | 298,753.08 |
| | | | $2,910,469.11 |

24 P. F. Smith—9

[Commonwealth *v.* Evans.]

" Leaving a balance of suspended claims in this office amounting to $261,749.08.

"I am, very respectfully,
"ALLEN RUTHERFORD, Auditor.

"Hon. Geo. S. Boutwell,
"Secretary of the Treasury."

For the Commonwealth, in rebuttal, Governor Hartranft testified that, when auditor-general, there were a large lot of vouchers in his office, triplicate vouchers in every instance, and in the proper form for collection ; defendant called for them three times, the last time with a letter from Governor Geary. Governor Hartranft had told defendant that he had intended to collect them himself. Defendant said the Act of Congress required them to be paid to an agent of the governor, and exhibited the act. The auditor-general's department regarded the claims as in proper form for collection. All the money collected on these claims came through defendant.

The Commonwealth gave other evidence, not important to be noted. What has been stated, the assignments of error and their answers, with the charge of Judge Pearson and the opinion of the Supreme Court, will sufficiently present the case.

The following are points of the Commonwealth, with their answers :—

" 2. The undisputed evidence in this case establishes that the defendant collected the following moneys, at the following dates, belonging to the Commonwealth, viz. : May 2d 1867, $78,516.89 ; October 27th 1868, $105,651.46, and August 26th 1870, $136,846.69, in all $321,014.44, which sum was largely in excess of any claim he could have had for compensation at that time, and by retention of such excess he forfeited his right to any compensation.'

Answer: " These sums were collected, according to the evidence, and should have been paid over, less the amount due for collection."

" 3. The defendant is not entitled to receive any compensation upon so much of the disallowed and suspended claims of the state against the United States as was credited to the state upon the claims of the United States against the state."

Answer : " If the claims referred to were suspended and disallowed, the defendant (if employed so to do) would be entitled to a reasonable compensation for having them allowed and settled."

" 5. The undisputed evidence shows the moneys so actually collected by said defendant, and under said joint resolution amount to the sum of $184,168.35, upon which sum the defendant is entitled to such compensation, if any, as the jury shall ascertain to be just, not to exceed ten per cent. thereof."

Answer : " We do not understand the facts to be as stated in this point, but that, in addition to the sum named therein, the

[Commonwealth v. Evans.]

defendant collected $136,846.09, and we see no reason why compensation should not be allowed for recovering that also at the same rate."

"7. The undisputed evidence showing that the defendant received of moneys belonging to the Commonwealth as follows: May 2d 1867, $78,516.89; October 22d 1868, $105,651.46, and August 26th 1870, $136,846.09; and only paid thereon to the Commonwealth, July 21st 1871, $29,967.53; the Commonwealth is entitled to a verdict for said three sums, with interest, less amount of said payment, and such compensation as the jury may allow for his services, if any, to be ascertained as hereinbefore directed."

Answer: "The law is as stated, with this addition, that the defendant is to be allowed a reasonable compensation, not exceeding ten per centum on the sums placed in his hands by the auditor-general, and also for attending to and procuring settlement of the suspended claims of the state against the United States, and having the indebtedness of the state discharged on the books of the United States treasury."

The following are defendant's points with their answers:—

1. "There is no evidence which shows that the money received by the defendant from the United States was received as a public officer, nor is it shown that the defendant acted in a professional capacity; therefore the plaintiff cannot recover on either of the first two counts in the narr."

Answer: "We do not consider that the money was received or collected by the defendant as a public officer, or that he was such, but was merely such agent as was created by the appointment of the governor and auditor-general, but that will not prevent a recovery on the first count of the narr."

4. "The defendant has a right to retain out of the money received by him from the United States as much thereof as amounts to a just compensation legally measured."

Answer: "This is so, unless the money collected was fraudulently withheld." •

6. "The percentage so to be allowed was and is to be counted on all the money recovered or allowed through the exertions of the defendant, whether it was satisfied by a warrant on which the money was actually paid, or by a counter warrant which defalked it upon a claim against the state."

Answer: "On all of the moneys collected a percentage is to be allowed upon the defalcation, a fair and equitable allowance is to be made according to the difficulties of the settlement and the magnitude of the claims."

Judge Pearson charged:—"The case under consideration is one of very considerable magnitude both to the Commonwealth and the defendant, as well on account of the money as the principles in-

[Commonwealth *v.* Evans.]

volved.   It is one that has greatly agitated the public mind, and
led to not a little newspaper controversy.

"You now know more of the facts of the case than any of the
numerous public agitators, as your knowledge is derived from legal
evidence, and by that alone will you be guided, discarding all that
you have heard by rumor, or gathered from the public press.

"At the commencement of the late rebellion, the state of Penn-
sylvania raised very considerable bodies of troops, and expended
large sums of money in aid of the national government.   The
United States assessed against the various states twenty million
of dollars, of which Pennsylvania assumed the payment of
$1,946,719.33, and was entitled to a deduction of fifteen per
centum for prompt payment.   She claimed to have advanced the
whole sum in the pay and equipment of the troops, but from the
evidence it would seem that the vouchers taken were not so formal
as required by the laws of Congress and the rules of the treasury
department, and were generally suspended or disallowed.   It
seems, from the testimony of Col. McMichael, to have been well
understood at the department at Washington that the state had in
point of fact paid her quota and was entitled to the fifteen per
cent., but no entries were made to that effect on the books of the
treasury, or settlements closed by the proper officers.   The
national government also lent the state $606,000 in the year 1862,
either in repayment or to enable her to equip her troops, raise
more, or meet loans.   Pennsylvania also claimed to have advanced
sums from time to time which were to be repaid by the United
States.   Col. McMichael says that all was well understood by the
then secretary of the treasury, but it would seem that at and after
that time some difficulty arose, and it is said that our state was
urged to make payment of her arrears, leaving out the suspended
or disallowed vouchers.   At this time an entirely new set of men
filled the treasury department, and the former arrangement seems
to have been misunderstood or disregarded.   On the 22d day of
March 1867, a joint resolution was passed authorizing the appoint-
ment of a special agent to collect disallowed or suspended claims
against the United States, and on the same day Geo. O. Evans
was appointed such agent.   Prior to this time, to wit, on the
27th of July 1861, an Act of Congress had been passed authoriz-
ing payments by the secretary of the treasury to the governors of
states or their authorized agents, the costs, charges and expenses
incurred by the states in enrolling, subsisting, clothing, equipping,
&c., troops employed in aiding to suppress the rebellion.

"The authority issued from the governor to Mr. Evans in due
form, appointing him a special agent to collect the disallowed and
suspended claims from the United States, and on the same day
Mr. Evans signed an agreement to collect all such money, so far as
in his power, and to pay over the same forthwith to the state trea-

[Commonwealth v. Evans.]

surer, *less the commission allowed,* and to make annual reports to
the state treasurer of the amounts collected, and the sources from
which derived; at the same time he gave bond in ten thousand
dollars for the faithful performance of his duty.    Neither the bond
nor agreement were required by law, but were taken by the
governor for the greater caution.    Under this appointment several
collections were made and paid into the treasury of very con-
siderable sums, of which you will have statements, and all of the
suspended and disallowed claims were finally settled at the account-
ing department of the United States, amounting in all to perhaps
some two million of dollars.    At an after time, to wit, on the
30th of March 1870, on the solicitation and advice of the
governor, the auditor-general placed in the hands of Mr. Evans,
the vouchers, showing claims by this state against the federal
government to a very large amount.    These sums will be laid
before you.    The auditor-general had contemplated settling these
claims himself, but on looking into the subject, it became very clear
that it must be done by an agent of the governor, and it was be-
lieved that there was little time to lose.

" [The auditor-general, therefore, gave them over to Mr. Evans,
under an agreement that he was to have a compensation of ten per
cent. for their collection, such being his construction of the resolu-
tion of March 22d 1867.    It was further agreed that Evans
should be paid travelling expenses, printing, stationery, clerk-hire,
&c., for preparing the claims for settlement, and if nothing was
realized, no compensation to be allowed.]    The governor on the
13th of April addressed a letter to the secretary of the treasury,
showing that he had appointed Mr. Evans his duly authorized
agent to settle these claims.    This was ultimately done by him
to the satisfaction of the state department, so far as shown.    We
have no doubt of the power of the governor to make the appoint-
ment of the special agent, under the resolution of the legislature,
and we also think that the auditor-general could employ an agent
when necessary, and for the interest of the state, by virtue of his
office.    He most clearly could have done it in the present case
with the sanction of the governor, who had full power to do it by
himself under the statute.    We do not believe, that either the
governor or the auditor-general had power to bind the state to
make compensation beyond the amount fixed by law, and the
actual sum to be paid must be determined by the court and jury.
In the course of these various settlements, there came into the
hands of the defendant the following sums: On the 1st day of
May 1867, $78,516.89; on the 28th October 1868, $105,651.46;
and on the 27th of August 1870, $138,846.09, making in all,
$321,014.44.    Of this, Mr. Evans claimed for percentage
$291,046.91, and paid into the treasury $29,967.53, and it is to
recover the above-stated balance of $291,046.91, that this suit was

brought. The Commonwealth claims that the defendant is not entitled to any percentage whatever, that he has forfeited all title thereto, by failing to pay over the money which came into 'his hands, or to render an account thereof to the proper department. He says, and so testifies, that the governor was made acquainted from time to time with all his doings, and that the same was not made public, lest their course of settlement might be defeated, and the interest of the state jeopardized. He has fully explained to you his reason for that course, and it is for you to judge of their truth and plausibility.

" [We state to you, as a rule of law, that if an agent or attorney collects a sum of money and fails to give his principal notice thereof, or to pay it over in a reasonable time, but fraudulently converts the same to his own use, he can recover nothing for his collections. If, in the present case, the defendant fraudulently set up a claim for fees to which he was not entitled, with a view of retaining the money, or for any other purpose, he can recover nothing.] Such we understand to be the rule of Balsbaugh *v.* Frazer, 7 Harris 99, and of several other cases. If, on the other hand, he honestly and fairly claimed the money in his hands as compensation for collections and settling the accounts between the state and the United States, although you might think that he claimed too much, yet you are not on that account to declare the whole compensation forfeited, but will fix the amount fairly due, allow that, and render your verdict against him for the residue.

" The character of this case was well calculated to raise a difficulty as to the compensation. It was doubtful if the agent should be paid his percentage merely for the money collected, or on all claims settled and allowed. Whether on the large expenditures of 1861, the vouchers for which had long been on file, but rejected and disallowed, or merely for what came into his hands in the form of cash, and was paid into the treasury, and whether it should also embrace the vouchers and claims handed over by the auditor-general. If business-men might, on the wording of this resolution, honestly differ as to whether the percentage should be paid on the whole or only a part, it might seem extremely harsh to forfeit the whole compensation. But for intentional fraud practised the forfeiture will be enforced. That is one of the first questions for you to decide. It is contended, however, on the part of the state, that the agent was obliged by law to pay the whole of the money into the treasury, and then look to the accounting department for an allowance of his percentage. Such is not the law in the ordinary case of principal and agent, or attorney and client, and we can see no good reason for a different rule here. The resolution of the legislature contemplates that the agent shall be ' paid out of his collection.' The agreement of Mr. Evans, made contemporaneously with his appointment, binds him to pay

into the treasury the money collected, 'less the commission allowed,' which shows what was understood by both parties. Had the money been paid into the treasury, and a large sum be determined by the department to be due the agent for collections, it could not be paid over, but must be reported to the next legislature for a special appropriation. We instruct you that the agent was not bound to pay the percentage due him into the state treasury, but should have paid over all, less that sum. In stating his account, Mr. Evans claimed ten per centum on all of the government claims which passed through his hands, and paid into the treasury $29,967.53, which he admitted to be due. For the defendant it is contended that the law gives ten per cent. on all that was either collected or settled and allowed; that when a sum is named, as here, not exceeding ten per cent., the whole can be claimed; that the party to receive has a right to so construe the words as to give him the whole allowance, and that such has been the uniform usage under laws so worded. There is no proof before us of any custom, although we may well suppose that the receiver generally got all that was in his power.

" We must therefore put a construction upon the words of the statute. If the legislature had intended to give ten per centum for the service, it would have said so. When the words used are, '*not exceeding ten per cent.,*' it shows that less may be paid and considered a sufficient allowance. The true sum must first be fixed, ordinarily by the accounting department, and ultimately by a court and jury. You must decide what is a fair allowance, not exceeding ten per cent. You will take into consideration that if nothing was recovered, nothing could be paid, and when men labor on such a contingency they are generally allowed more in case of success than when they are to receive compensation, even if unsuccessful. The testimony is to that effect in the present case. Mr. Evans says he would not have undertaken on that contingency for a less sum, and one other witness fixes the same amount. Taking it for granted that the joint resolution intended to allow a percentage on all money collected from the federal government and paid into the state treasury on disallowed or suspended claims, does it prove that the same sum is to be retained for merely making a settlement of mutual demands which balance each other, and where little, if anything, is paid by either party? We do not so construe the resolution. The evidence shows that a large expenditure took place by the state for the benefit of the nation, and the justice of remuneration was acknowledged. The whole account was most carefully made out and presented at the United States treasury, but the vouchers were so irregular as to lead to their rejection and disallowance. The resolution recites that, by carefully supplying deficient testimony, many of the sums can be collected. The testimony of Mr. Evans shows that no new

[Commonwealth *v.* Evans.]

or additional proof was procured, or new vouchers obtained; but, by taking up the accounts as prepared by Colonel McMichael, and carefully explaining them to the auditor and controller of the treasury, the whole was ultimately allowed and settled.

" [Mr. Evans states that he spent some twenty days in completing this arrangement, having the whole sum set off against the claims of the United States, and all finally settled on the books of the department. For this service we do not consider that Mr. Evans is entitled to receive the percentage mentioned in the resolution. His labor is very different from that bestowed on the other claims, and his responsibility falls greatly short of that arising from receiving and paying over large sums of money. The services do not come within the words or intention of the resolution. Yet for this valuable service Mr. Evans is not to go unrequited, although perhaps not entitled to ten per cent. on nearly two millions of dollars, or at least considerably over one million, he should be paid liberally. You can allow him a reasonable percentage or a lumped sum. Pay him well according to his skill, labor and success, but we cannot believe that for such services he is entitled to over one hundred thousand dollars as claimed. His remuneration is a question for you.] Take into consideration the evidence of Col. Mc-Michael that at one time the account of the state was all allowed; then that it was found rejected on the books, and payment demanded of the alleged indebtedness of this state, at which the then Governor Curtin expressed great surprise that it was persisted in, and the account never finally settled and closed until effected through the instrumentality of Mr. Evans.

" We come next to consider the claims placed in the hands of Mr. Evans by the auditor-general under the solicitation of the governor, and pursuant to his appointment. The vouchers General Hartranft thinks were reasonably correct in form, but not set forth in any regular account; were filed away in pigeon-holes and received and arranged by Mr. Evans. They amount, according to our estimate, to some $815,589.33. The whole of this claim was settled and allowed. For this service it is pretty clear that the auditor-general expected the agent would be paid not exceeding ten per cent., but as much less as that officer might deem right. The claim did not come before him for allowance, but is now before you in a common-law action. You must fix the amount and can say that it shall be three, five or ten per cent., as you may think just and reasonable. We do not consider that in making this settlement Evans was the agent of the auditor-general alone (for as such he would not have been recognised at Washington) but of the governor also. He makes his settlement in the latter capacity, and claims pay under the resolution of the legislature as a special agent. Allow what you consider right under all of the circumstances. There is one demand for percentage amounting to over

[Commonwealth *v.* Evans.]

$60,000, the justice of which we are unable to perceive.    It is said to be claimed on account of the $606,000 lent to the state by the United States.    That money was not collected for, but was due by Pennsylvania to the United States ; as such it was not collected but paid.    True, there may have been a set-off against it in the indebtedness due to the state ; but if so, that was settled in some of the claims already referred to, either by an offset against the vouchers from the auditor-general's office or some of the large expenditures of 1861.    Both of these we have already directed you to settle.    In the form spoken of, this is indisputable ; it may be demanded as making up the sums already recited ; is not claimed in that form and was mentioned incidentally.

" The defendant avers that the plaintiff is not entitled to recover, because in the first count of his *narr.* it sets forth that the defendant collected the money for the Commonwealth in his professional employment, as attorney in fact, and agent of the Commonwealth. In the second count, for so much money had and received by the said defendant as a public officer, and in the third, that he is indebted on an account stated.    We are of the opinion that there is no evidence of an account stated between the parties which would support the third count, and that the defendant is not a public officer as averred in the second count.    We have heretofore decided, and now instruct you, that the authority issued by the governor to Mr. Evans did not make him a public officer.    He was merely a *special agent.*    We had occasion to examine into that subject very carefully some time in the latter part of 1871, and delivered an elaborate opinion, to which we still adhere, but shall not now consume our time or your patience in discussing it again.    Your verdict cannot be in favor of the state on either of these counts. The first count we consider substantially supported, so far as relates to the receipt of the money as an agent, but whether in his ' professional employment' or merely as a ' *special agent*' for the particular service, must be determined by you.    The act abolishing imprisonment for debt excludes from relief persons receiving money as ' officers, or for any misconduct or neglect in office, or in any professional employment.'    It is contended by the defendant that he was not engaged in any professional employment, and therefore should not be declared against in that capacity, as it would subject him to imprisonment for any sum found against him. The plaintiff's counsel contend that the money was received by the defendant in his professional employment, as an attorney in fact, and agent of the Commonwealth.    That he received it as an agent of the state is very clear.    There are certain professions which are undoubtedly covered by the words of the statute—that of attorney at law—neither of the others, designated as learned professions, perhaps come within the statute, as they have little to do with collecting money for others.    We are inclined to think that there

[Commonwealth *v.* Evans.]

may be other 'professional employment.' A man may be a professional claim agent, having a license for their collection. He may be a professional agent for procuring patents or pensions, follow either as a business, and would probably come within the Act of Assembly. In the present case the defendant states that he never was employed in settling up claims before or since; that he merely acted as a special agent, under the power of attorney issued by the governor, and that it was not his professional employment. Whether he is subject to imprisonment for failing to pay over money received in a *fiduciary capacity* is not to be determined at present. If the question had to be decided by the court whether this money was collected by the defendant in his professional employment as an agent, and we came to the conclusion that it was not, we would direct an amendment of the *narr.*, by striking out the averment. We would correct the declaration to correspond with the evidence. But in our opinion it is a question for a jury. You can find the fact specially, and we will put your verdict in form. There is certainly little if any evidence tending to show that the defendant was a professional agent, or followed the general business of acting as an attorney in fact, as is the case with many persons who act as general land agents, and hold themselves out to the world as such. Every question can be fully met by a special verdict.

"If you find that a sum of money is due to the state by the defendant, it will bear interest from the time it was received, and should have been paid into the treasury. This, with the answers to the points, will cover the whole case, and the facts require your careful deliberation."

The jury returned this verdict : " The jury find in favor of Commonwealth of Pennsylvania, on the first count, in the sum of $149,726.53, and that the defendant was not an officer or professional agent, but received the money in trust, as a special agent appointed by the governor of the Commonwealth, pursuant to the provisions of the joint resolution of the legislature, passed the 22d day of March 1867, as per appointment made on the 22d March 1867, and by John F. Hartranft, then auditor-general, on the 30th day of March 1870, *pro ut* said appointment made part of this verdict, and we find that the second and third counts of the *narr.* are not supported by any evidence in the case."

Judgment was entered on the verdict April 7th 1873.

Each party took a writ of error.

The Commonwealth assigned for error:

That the court erred in the answers to the Commonwealth's and defendant's points, as above stated, and the parts of the charge in brackets; also in overruling the offer of the settlement by the accounting officers.

The defendant assigned for error the rejection of his offers of evidence.

_L. D. Gilbert_, Deputy Attorney-General and ·W. Mac Veagh (with whom was _Dimmick_, Attorney-General), for the Commonwealth.

_L. W. Hall_ and _Black_ (with whom was _R. A. Lamberton_), for Evans.—The defendant was not a public officer. They cited Riddle v. Bedford Co., 7 S. & R. 386; Leigh's Case, 1 Munf. 475; Commonwealth v. Binns, 17 S. & R. 219; Sheboygan v. Parker, 3 Wallace 93; Ohio v. Kennon, 7 Ohio St. R. 546. Evans was entitled to full compensation: Balsbaugh v. Fraser, 7 Harris 95; Dubois's Appeal, 2 Wright 234.

The opinion of the court was delivered, July 2d 1873, by

SHARSWOOD, J.—These are writs of error by both parties to a judgment of the Court of Common Pleas of Dauphin county, upon the verdict of a jury rendered in a suit by the Commonwealth against George O. Evans. The case was tried by the learned president of the court with his accustomed ability and impartiality. We have examined carefully all his rulings on the subject of evidence which have been complained of in this court by either party, and find nothing upon which he can be convicted of error. Nor can any of the errors assigned to his answers and charge be sustained, except as to three points, which in different forms appear in several of the specifications by the Commonwealth. It will be unnecessary to consider these several specifications more in detail.

We are of the opinion that the defendant below was a public officer within the purview of the first section of the Act of July 12th 1842, Pamph. L. 339, which excepts from the provisions of that act, abolishing imprisonment for debt, proceeding for the recovery of "moneys collected by any public officer." It may sometimes, indeed, be a difficult matter to distinguish between a public officer and a person employed by the government to perform some special service by contract. It is clear that it is not all public debtors who are within the exception of the Act of 1842, nor all parties, who, under the Act of March 30th 1811, 6 Sm. L. 225, are bound to account to the auditor-general. But we are of the opinion that all persons who, by authority of law, are intrusted with the receipt of public moneys, through whose hands money due to the public, or belonging to it, passes on its way to the public treasury, must be so considered, by whatever name or title they may be designated in the law authorizing their appointment, and whether the service be special or general, transient or permanent. It is quite unnecessary to discuss the authorities which have been cited upon this point. None of them bear any resemblance to this case, except, perhaps, The United States v. Maurice, 2 Brock. 96, and that, we think, sustains the conclusion at which we have arrived. It was there held, that an agent for fortifications, appointed under the army regulations, which had

received the sanction of Congress, was a public officer from whom
the government had a right to exact an official bond with sureties,
and that such bond was therefore a valid obligation. The appoint-
ment there as here was for an indefinite period. Nor does it seem
to us to distinguish this case from that, that this appointment was
to collect a single claim, or rather a set of claims against a par-
ticular debtor. No one can doubt that collectors of public taxes
are within the letter of the exception of the Act of 1842. Sup-
pose a special tax laid for a temporary purpose, is it susceptible
of any more doubt that a person appointed by authority of law to
collect such tax—call him special collector or special agent—would
be equally within the exception, and moneys collected by him be
"moneys collected by a public officer?" Can it make any dif-
ference that a person is commissioned by the governor as a
general agent to collect all claims of the Commonwealth, or as a
special agent to collect only one particular claim? We think not.
Mr. Evans was appointed by virtue of a joint resolution of the
legislature, approved March 22d 1867, Pamph. L. 1343, by which
it was provided that the governor be and is hereby authorized to
appoint a special agent to collect the disallowed and suspended
claims of the state against the United States. Under this reso-
lution the governor appointed Mr. Evans, and very properly issued
and delivered to him a commission under the great seal of the
state. This commission is in the usual form of an official com-
mission. In like manner he required of him to give bonds with
two sureties. The bond is to the Commonwealth, and is conditioned
that " the above bounden George O. Evans, special agent as afore-
said, shall faithfully perform his official duties under said joint
resolution." It is an official bond. It is true that it does not
appear that he took the oath required of all officers, executive and
judicial, by the eighth article of the Constitution, but it does
not follow that he was not bound to take such oath in order to
render his qualification complete: Riddle *v.* Bedford County, 7
S. & R. 386. He certainly had official duties under the joint
resolution, as his bond acknowledged, which, when he accepted
the position, he was bound to perform with fidelity. It is not
a case of service rendered to the Commonwealth under a con-
tract. The joint resolution did not empower the governor to make
any contract, and as the learned judge rightly decided upon an
offer of evidence, he had no authority outside of the resolution to
do so. Even if the fact were that Evans did enter into a contract
or contracts with the governor and auditor-general, it did not change
his character and responsibility as an officer. " If," says Mr. Chief
Justice Marshall, " it may be converted into a contract, it must
be a contract to perform the duties of the office of agent, and such
an office must exist with ascertained duties, or there is no standard
by which the extent of the condition can be measured." 2 Brock.

[Commonwealth *v.* Evans.]

103. A contract to perform the duties of an office is implied on the part of every person who accepts it: 3 Bl. Com. 165. We think, therefore, that the moneys collected by Evans were moneys collected by a public officer within the exception of the Act of 1842, and the learned judge below ought so to have instructed the jury, and not that the defendant was entitled to a verdict in his favor on the second count of the declaration.

There was a further error in the charge upon the subject of the compensation of Evans for his services in the matter of the claims placed in his hands for collection by Auditor-General Hartranft. The jury were directed, "you must fix the amount, and can say that it shall be three, five or ten per cent. as you may think just and reasonable." He had before rightly directed the jury that the defendant could not be allowed more than ten per cent. on the amount actually collected by virtue of his appointment under the joint resolution. He does not in this case limit the commission to the amount actually collected. But we think it clear from the letters of Governor Geary to Auditor-General Hartranft, dated March 29th 1870, and from the paper signed by the latter, dated March 30th 1870, that the vouchers for these claims were handed over to Evans as the special agent, under the joint resolution requiring the auditor-general to furnish him with these vouchers. Governor Geary names and describes him as "special agent of the state under the joint resolution of the legislature of March 22d 1867," and Auditor-General Hartranft carefully stipulates that his compensation for these services shall be "out of the commission of ten per cent. allowed by the joint resolution;" that is, as we think it must be, reasonably construed; the services rendered in the matter of these claims shall be considered in determining the rate of commission to be fixed under the joint resolution, and not in the whole to exceed the maximum of that commission, since it is to be paid out of it.

One other point remains to be considered upon the subject of the forfeiture by Evans of his right to any commission. The learned judge undoubtedly laid down the rule correctly as between private principal and agent. But that was not the relation between the Commonwealth and Mr. Evans. Admitting even that he was not a public officer, it cannot be questioned that he was an agent liable to account under Act of March 30th 1811. The first section of that includes, as such, expressly, "persons intrusted with the receipt, or who now or hereafter may become possessed of public money." Evans indisputably fell within this category. The fourteenth section of that act provides "that no allowance for commissions shall in any instance be made by the accounting officers, in case of refusal or neglect to furnish accounts." It cannot, with any show of reason, be maintained that this provision applies only to the accounting officers. It is a rule of forfeiture, applica-

[Commonwealth *v.* Evans.]

ble in all cases between the state and her agents, who are bound to account, and is to be applied whether the question arises upon an appeal from a settlement or in a common law action, if the Commonwealth chose to resort to that remedy.    The legislature has laid down a very simple and just rule—essential to the safety of the state—and which can never work injustice to her honest agents.    She ought in no case to be compelled to pay double or treble commissions for the collection of her claims—first to the original agent, and then to the agent or attorney employed to collect of that agent, and so on, as it may be, until the whole claim is exhausted in commissions.    The simple rule laid down, and which she has an undoubted right to lay down, is to furnish accounts.    She says to her agents, report the amount you have collected—make whatever offsets you may thing yourself entitled to; the accounting officers will then have the means of making a settlement with you, and if you are dissatisfied with their decision you can appeal. Evans was bound, under the Act of 1811, to account promptly— at least within a reasonable time, and besides, it was a part of the condition of his official bond that he would "make semi-annual reports to the state treasurer of the amounts collected, and of the sources from which derived."    It is not pretended that he made any reports or furnished any accounts within any reasonable time or within the time named in his bond.    He received from the United States, May 1st 1867, $78,516.39; October 27th 1868, $105,651.46, and August 20th 1870, $136,846.09.    He furnished no accounts whatever until July 21st 1871.    He said on his examination as a witness in court: " I reported to the governor how I was succeeding in my collections.    I did not report in writing, because it was not considered expedient, and against the interest of the state.    The state had a large balance unsettled, and if reported and got into the newspapers would damage our claims. The governor requested that no public report should be made for the good of the state to facilitate the claims."    Governor Geary was not alive at the time of the trial to meet this allegation.    It is too clear for argument that the governor had no power to release the agent from one of the plainest of his duties, as well as the condition of his official bond, upon any such notion of expediency. The attention of the learned judge does not appear to have been distinctly called to the provision of the fourteenth section of the Act of 1811, and if this was the only question in the cause we might hesitate to reverse upon it.    It is, however, necessarily involved in the answer to the defendant's fourth point, which forms the subject of the sixth assignment of error by the Commonwealth.

Judgment reversed, and *venire facias de novo* awarded.